**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| **MARY TURNER,** | ) | **CIVIL ACTION NO.:**   3:18-728-MBS |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **COMPLAINT FOR VIOLATIONS OF** |
| **JIMMY E. ADDISON, GREGORY E.** | ) | **THE FEDERAL SECURITIES LAWS** |
| **ALIFF, JAMES A. BENNETT, JOHN** | ) | |
| **F.A.V. CECIL, SHARON A. DECKER,** | ) | |
| **D. MAYBANK HAGOOD, LYNNE M.** | ) | |
| **MILLER, JAMES W. ROQUEMORE** | ) | **JURY TRIAL DEMANDED** |
| **MACEO K. SLOAN, ALFREDO** | ) | |
| **TRUJILLO, SCANA CORPORATION,** | ) | |
| **DOMINION ENERGY, INC., and** | ) | |
| **SEDONA CORP.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**COMPLAINT FOR VIOLATIONS**
**OF FEDERAL SECURITIES LAWS**

Plaintiff Mary Turner ("Plaintiff"), by her undersigned attorneys, alleges the following on information and belief, except as to the allegations specifically pertaining to her, which are based on personal knowledge.

**I.      NATURE AND SUMMARY OF THE ACTION**

1.      Plaintiff, a public stockholder of SCANA Corporation ("SCANA" or the "Company"), brings this action against SCANA and SCANA's board of directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a), and Rules 14a-9, 17 C.F.R. 240.14a-9, 17 C.F.R. § 244.100, and 17 C.F.R. § 22.1015(b)(4) promulgated thereunder by the U.S. Securities and Exchange commission (the "SEC").

2.      On January 3, 2018, SCANA announced that it had entered into a definitive

agreement (the "Merger Agreement"), dated January 2, 2018, pursuant to which Dominion Energy, Inc. ("Dominion" or "Parent"), through its wholly owned subsidiary, Sedona Corp. (the "Merger Sub"), will merge with SCANA, with SCANA surviving as a wholly-owned subsidiary of Dominion (the "Proposed Transaction").

3.      Under the terms of the Merger Agreement, SCANA shareholders are to receive 0.6690 shares of Dominion common stock for each share of SCANA common stock held (the "Merger Consideration").  Based on Dominion's volume-weighted average stock price of the last 30 trading days ended January 2, 2018, this equates to a value of approximately $55.35 per SCANA share, which represents an approximate 30% premium to the volume-weighted average stock price of SCANA's last 30 trading days ended January 2, 2018.  (On January 2, 2018, the day before the Proposed Transaction was announced, SCANA shares traded at $38.84 per share). Including the assumption of $6.74 billion debt, the Proposed Transaction is valued at approximately $14.6 billion.

4.      Both companies' boards of directors have approved the Proposed Transaction, and it is anticipated that it will close by the end of the third quarter of 2018.

5.      On February 14, 2018, Defendants filed a Schedule 14A Preliminary Proxy Statement (the "Proxy") with the United States Securities and Exchange Commission ("SEC"). The Proxy is deficient and misleading in that it fails to provide adequate disclosure of all material information related to the Proposed Transaction, in contravention of sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 14a-9 promulgated thereunder.  Without all material information, Plaintiff cannot make an informed decision to exchange her shares in the upcoming stockholder vote.  Plaintiff seeks an order

requiring Defendants[1] to disclose the omitted and/or misrepresented material information concerning the Proposed Transaction and/or injunctive relief preventing consummation of the Proposed Transaction unless and until the Company discloses the omitted and/or misrepresented material information.

## II.    JURISDICTION AND VENUE

6.    The claims asserted herein arise under §§ 14(a) and 20(a) of the Exchange Act, 15 U.S.C. § 78aa.  The Court has subject matter jurisdiction pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 US.C. § 1331 (federal question jurisdiction).

7.    The Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

8.    Venue is proper in this District under § 27 of the Exchange Act, 15 U.S.C. §§ 78aa, as well as pursuant to 28 U.S.C. § 1391(a), because:  (i) SCANA maintains its principal place of business in this District; (ii) one of more of the Defendants either reside in or maintain executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.    THE PARTIES

9.    Plaintiff is a resident of Florence County, South Carolina.  At all times relevant

---

[1]  SCANA, the Individual Defendants (defined below), Dominion and Merger Sub are herein collectively referred to as "Defendants."

hereto, Plaintiff was a holder of shares of SCANA common stock.

10.     Defendant SCANA is an energy-based holding company principally engaged through subsidiaries in electric and natural gas utility operations and other energy-related businesses in South Carolina, North Carolina and Georgia.  SCANA is incorporated in South Carolina and maintains its principal executive offices at 100 SCANA Parkway, Cayee, South Carolina 29033.  SCANA's stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "SCG."   SCANA's principal subsidiary, South Carolina Electric & Gas Company ("SCE&G) is engaged in the generation, transmission, distribution and sale of electricity and transportation of natural gas to customers.  (Unless noted otherwise, "SCANA" herein denotes SCANA and its SCE&G subsidiary together.)

11.     Defendant Jimmy E. Addison ("Addison") currently serves as the Company's Chief Executive Officer ("CEO") and previously served as the Company's Chief Financial Officer ("CFO").  On October 31, 2017, SCANA announced Addison would become CEO of SCANA, effective January 1, 2018.

12.     Defendant Gregory E. Aliff ("Aliff") has served as a director of the Company since October 2015.  During the Relevant Period, Aliff has served as the Chairman of SCANA's Audit Committee, and as a member of the Company's Executive and Nominating and Governance Committees.  Upon information and belief, Aliff is a citizen of Virginia.

13.     Defendant James A. Bennett ("Bennett") has served as a director of the Company since 1997.  Bennett serves as the Chairman of the Company's Compensation Committee and is a member of the Company's Executive and Audit Committees.  During the Relevant Period, Bennett was a member of the Nuclear Oversight Committee.  Upon information and belief, Bennett is a citizen of South Carolina.

4

14. Defendant John F.A.V. Cecil ("Cecil") has served as a director of the Company since 2013. During the Relevant Period, Cecil has served on the Company's Audit and Compensation Committees. Upon information and belief, Cecil is a citizen of North Carolina.

15. Defendant Sharon A. Decker ("Decker") has served as a director of the Company since October 2015. Decker previously served as a director of the Company from 2005 until April 2013. During the Relevant Period, Decker has served on the Company's Compensation and Nuclear Oversight Committees. Upon information and belief, Decker is a citizen of North Carolina.

16. Defendant D. Maybank Hagood ("Hagood") has served as a director of the Company since 1999 and is the Company's Lead Director. During the Relevant Period, Hagood has served on the Company's Executive, Nuclear Oversight, and Nominating and Governance Committees. In 2015, Hagood served as Chairman of the Audit Committee. Upon information and belief, Hagood is a citizen of South Carolina.

17. Defendant Lynne M. Miller ("Miller") has served as a director of the Company since 1997. During the Relevant Period, Miller has served on the Company's Audit and Nominating and Governance Committees. Miller is an environmental consultant. Upon information and belief, Miller is a citizen of Virginia.

18. Defendant James W. Roquemore ("Roquemore") has served as a director of the Company since 2007. During the Relevant Period, Roquemore has served as the Chairman of the Company's Nuclear Oversight Committee and on SCANA's Executive and Compensation Committees. Upon information and belief, Roquemore is a citizen of South Carolina.

19. Defendant Maceo K. Sloan ("Sloan") has served as a director of the Company since 1997. During the Relevant Period, Sloan has served on the Company's Nuclear Oversight

and Compensation Committees, including as Chairman of the Compensation Committee, and as a member of SCANA's Executive Committee.  Upon information and belief, Sloan is a citizen of North Carolina.

20.     Defendant Alfredo Trujillo ("Trujillo") has served as a director of the Company since 2013.  During the Relevant Period, Trujillo has served on the Company's Nuclear Oversight and Nominating and Governance Committees.  Upon information and belief, Trujillo is a citizen of Georgia.

21.     The defendants identified in paragraphs 11 through 20 are collectively referred to herein as the "Individual Defendants" or the "Board."  By virtue of their corporate directorships, the Individual Defendants are fiduciaries of Plaintiff and the other Company stockholders.  Each Individual Defendant herein is sued individually as well as in his or her capacity as an officer and/or director of the Company, and the liability of each arises from the fact that each has engaged in all or part of the unlawful acts, plans, schemes, or transactions of which Plaintiff complains of herein.

22.     Defendant Dominion is a Virginia corporation with its corporate headquarters located in Richmond, Virginia 23219.  Dominion is listed on the New York Stock Exchange and trades under the symbol "D."  Dominion is a power and energy company that supplies natural gas to the eastern part of the United States.

23.     Dominion formed Sedona Corp. (the "Merger Sub"), a South Carolina corporation, for purposes of consummating the Proposed Transaction.

## IV.     SUBSTANTIVE ALLEGATIONS

### *SCANA's Failed Nuclear Project*

24.     In 2007, SCANA successfully lobbied the South Carolina legislature to pass new

legislation that would allow it to construct two new nuclear reactors at the site of its V.C. Summer Nuclear Generating Station (the "Nuclear Project"). Legislation known as the Base Load Review Act ("BLRA") was also passed at that time, which allowed SCANA to absorb a significant amount of the costs of the Nuclear Project from the Company's ratepayers.

25.     In 2009, SCE&G and Santee Cooper, a state-owned electric utility also known as the South Carolina Public Service Authority, undertook preliminary work on the Nuclear Project. SCANA initially projected that the first reactor would be on-line and generating power as early as 2016, and the second by 2019. The total projected cost at the time was $9.8 billion and it was referred to as one of the most ambitious construction efforts in South Carolina history.

26.     After going through multi-year federal and state approval processes, SCANA, along with its partners, began construction on the Nuclear Project in March 2013. However, soon after construction began, the Nuclear Project experienced significant cost-overruns and delays, causing SCANA to petition the South Carolina Public Service Commission ("SCPSC") for further rate increases and schedule extensions as cost-overruns and delays piled up.

27.     Ultimately, on July 31, 2017, SCANA announced that it would abandon the Nuclear Project. On August 1, 2017, SCE&G filed an abandonment petition, which sought approval to charge ratepayers the difference between the $5 billion it already spent on the Nuclear Project, less the $1.7 billion it had already collected from ratepayers, or $3.3 billion. SCANA's stock immediately closed up on this news, from $61.19 per share on opening of the market on July 31, 2017, to $ 64.81 per share on the opening of the market on August 1, 2017, $67.56 at the close of the market on August 1, 2017, and it continued to close at between $63 and $67 per share as of the close of the market on August 8, 2017.

28.     On August 9, 2017, the South Carolina Office of Regulatory Staff ("SCORS")

filed a motion to dismiss SCE&G's abandonment petition, thereby challenging SCANA's ability to recover any further costs of the failed Nuclear Project from ratepayers. On this news, SCANA's stock price dropped from $63.69 per share when the markets opened on August 9, 2017 to $62.01 per share by the close of the market on August 10, 2017.

29.     On September 26, 2017, the South Carolina Attorney General's office delivered a 57-page opinion that questioned the constitutionality of the BLRA.  On the same day, SCORS filed a petition with the SCPSC, requesting that the commission issue an order directing SCE&G to immediately suspend the collection of revised rates currently being collected under the BLRA. On this news, SCANA's stock price dropped from $56.25 per share when the markets opened on September 26, 2017 to $51.22 per share by the time the markets closed on September 27, 2017, a roughly **10% drop**.  By close of the market on September 29, 2017, SCANA's stock price fell to $48.49 per share.

30.     On December 20, 2017, in an action filed by Friends of the Earth and the Sierra Club seeking the return of ratepayer money already collected for the Nuclear Project ($1.7 billion), the SCPSC denied SCE&G's motion to dismiss, setting the stage for a trial on this issue in early 2018.  On this news, SCANA's stock price dropped from $41.90 per share when the markets opened on December 20, 2017 to $37.39 per share by the close of market on December 21, 2017, a greater than **20% drop**.

31.     In total, since SCORS filed its motion to dismiss SCANA's abandonment petition on August 9, 2017, SCANA's stock price has dropped from $63.69 to $42.47 per share as of January 18, 2018, largely based on negative news related to the risks in the Company's ability to collect $3.3 billion in additional charges to ratepayers.

32.     On January 31, 2018, the South Carolina House voted 119-1 to temporarily

prevent SCE&G from charging ratepayers for the failed Nuclear Project until regulators and the courts decide if the Company is entitled to further charge ratepayers for the failed Nuclear Project.  South Carolina Governor Henry McMaster said that he would sign the legislation if approved by the South Carolina Senate.

33.     On February 5, 2018, Moody's downgraded SCANA's credit rating from Baa3 to Ba1 and SCE&G's credit rating from Baa2 to Baa3, subprime classifications often referred to as "junk" status, stating that the downgrades were "driven by a political and regulatory environment that has become exceedingly contentious and uncertain, and our assumption that SCE&G will ultimately be required to make considerable rate concessions to move forward."

34.     Following the legislature's vote and Moody's downgrade, SCANA's stock price declined from approximately $40 on January 31, 2018 to $35 on February 8, 2018.

35.     Company insiders have recognized that the "key consideration" underlying its stock price is whether SCANA will be able to recover funds from ratepayers for the costs of the Nuclear Project.  For example, during an earnings call on October 26, 2016, defendant Addison, then SCANA's CFO and Executive Vice President, stated:

> At this time, we are unable to provide long-term earnings guidance. While there are fundamental positive factors such as our strong customer growth and the continued expansion of our regulated gas businesses, the key consideration will obviously be the treatment of the abandoned new nuclear project. Once the nuclear abandonment recovery has been addressed, we will provide updated long-term guidance.

**The Process Preceding the Proposed Transaction**

36.     According to the Proxy, the following events and negotiations led to the Proposed Transaction:

•     In January 2017, SCANA's board voted to explore the possibility of a sale of the Company or merger with another company.  The decision came a month after news reports raised questions about the financial stability of Westinghouse Electric ("Westinghouse"), the

lead contractor at the V.C. Summer nuclear project.

- In late March 2017, soon after Westinghouse filed for bankruptcy, the chief executive of an unnamed utility described as "Party A" approached then-SCANA chief executive Kevin Marsh ("Marsh") at an industry event about the possibility of pursuing a strategic transaction or buyout.

- In May 2017, Dominion's chief executive, Tom Farrell ("Farrell"), set up a May 5 Meeting with Marsh to discuss "various concepts and potential terms related to a potential terms to a potential strategic transaction between SCANA and Dominion Energy."  While Farrell did not make a formal offer, he suggested a half-cash, half-stock merger that would have paid SCANA shareholders a 15% premium to the value of their stock.  Marsh said he would get back to Farrell after SCANA was finished evaluating the status of the Nuclear Project.

- Marsh relayed the conversation with Farrell to SCANA's board of directors, but the board decided against seriously considering the offer, given the considerable uncertainty surrounding the Nuclear Project and the challenges that third parties would have in valuing SCANA stock in light of those uncertainties.

- A week later, Marsh arranged a meeting with the chief executive of a third power company, described of as Party B, who told Marsh his company was not interested in a deal.

- On July 12, 2017, SCANA and Dominion executives met again.  Marsh wanted to know if Dominion would be interested in buying some or all of state-owned Santee Cooper's 45% ownership stake in the Nuclear Project.  Dominion indicated it was not interested.

- On July 31, 2017, Santee Cooper pulled out of the Nuclear Project. Santee Cooper's move prompted SCANA to also pull out of the Nuclear Project later that day.

- In early August 2017, Marsh spoke with executives from three unnamed utility

companies, including a new contender described as Party C.  Parties A and C expressed interest in a strategic transaction with SCANA, while Party B remained uninterested.

- On October 1, 2017, Marsh and Jimmy Addison, then SCANA's CFO and now its CEO, met with Dominion executives to discuss another proposal from Dominion.  That deal would give SCANA shareholders cash for 30% of the value of their stock and Dominion stock for the remaining 70%, lowered the bills of SCE&G customers, and shortened the time period that customers would have continued to pay for the failed Nuclear Project.

- On October 4, 2017, the CEO of Party A called Marsh and learned SCANA had received a tentative offer.  The executive again expressed interest in a similar transaction but said his company would not make an offer unless SCANA agreed not to negotiate with any other companies.

- On October 6, 2017, Party C again expressed interest but did not make a proposal. That same day, the Board, meeting with its legal representative as well as Morgan Stanley & Co. LLC ("Morgan Stanley") and RBC Capital Markets, Inc. ("RBC Capital") (both of which were soon to be officially hired as SCANA's financial advisors on October 13), and decided to begin formally exploring a "strategic transaction" with Dominion and Party A.  The Company entered into confidentiality agreements with both companies on October 8, while refusing to grant either company exclusive negotiating rights.

- On October 10, 2017, Party B which previously had said it had no interest in buying SCANA, said it had had a change of heart but offered no details of a future proposal.

- In mid-October 2017, Party A pulled out of its buyout negotiations, citing the uncertainty surrounding SCANA and its future electric rates.  That led SCANA to move forward with its Dominion negotiations.

- On November 27, 2017, Dominion offered SCANA an updated offer pursuant to which SCANA shareholders would get 20 to 25% of the value of their stock in cash, with the rest in Dominion stock.

- On a November 29, 2017, the Board approved more discussions with Dominion after Marsh and Addison endorsed Dominion's offer.

- On December 19, 2017, Addison met with an executive of Party C. The company was interested in buying SCANA, but it also made a separate, $2.2 billion offer to buy SCANA's North Carolina-based natural gas subsidiary, PSNC Energy. That bid was rejected after Addison advised the SCANA board that the offer undervalued PSNC Energy.

- On January 2, 2018, Dominion and SCANA finalized the Proposed Transaction. SCANA's board voted unanimously for the acquisition after it was endorsed by both Morgan Stanley and RBC.

***The Proposed Transaction***

37.    On January 3, 2018, the Company and Dominion jointly announced the Proposed Transaction. The press release stated, in relevant part:

> RICHMOND, Va., and CAYCE, S.C. – Dominion Energy, Inc. (NYSE: D) and SCANA Corporation (NYSE: SCG) today announced an agreement for the companies to combine in a stock-for-stock merger in which SCANA shareholders would receive 0.6690 shares of Dominion Energy common stock for each share of SCANA common stock the equivalent of $55.35 per share, or about $7.9 billion based on Dominion Energy's volume-weighted average stock price of the last 30 trading days ended Jan. 2, 2018. Including assumption of debt, the value of the transaction is approximately $14.6 billion.

> The agreement also calls for significant benefits to SCANA's South Carolina Electric & Gas Company subsidiary (SCE&G) electric customers to offset previous and future costs related to the withdrawn V.C. Summer Units 2 and 3 project. After the closing of the merger and subject to regulatory approvals, this includes:

> - A $1.3 billion cash payment within 90 days upon completion of the merger to all customers, worth $1,000 for the average residential electric customer. Payments

would vary based on the amount of electricity used in the 12 months prior to the merger closing.

- An estimated additional 5 percent rate reduction from current levels, equal to more than $7 a month for a typical SCE&G residential customer, resulting from a $575 million refund of amounts previously collected form customers and savings of lower federal corporate taxes under recently enacted federal fax reform.

- A more than $1.7 billion write-off of existing V.C. Summer 2 and 3 capital and regulatory assets which would never be collected from customers. This allows for the elimination of all related customer costs over 20 years instead of over the previously proposed 50-60 years.

- Completion of the $180 million purchase of natural-gas fired power state (Columbia Energy Center) at no cost to customers to fulfill generation needs.

In addition, Dominion Energy would provide funding for $1 million a year in increased charitable contributions in SCANA[s communities for at least five years, and SCANA employees would have employment protections until 2020.

SCANA would operate as a wholly owned subsidiary of Dominion Energy. It would maintain its significant community presence, local management structure and the headquarters of its SCE&G utility in South Carolina.

38.    Pursuant to the Merger Agreement, the Proposed Acquisition is contingent on:

(i) the BLRA not being amended in a manner that would be detrimental to the Company (*i.e.*, not being amended to restrict the Company's ability to recover funds from ratepayers); and (ii) the SCPSC approving the petition filed by SCE&G and Dominion that explicitly allows Dominion to recover the $3.3 billion capital invested in the Nuclear Project and not yet recovered from ratepayers (the "SCPSC Petition"). Specifically, the Merger Agreement states, in relevant part:

SECTION 6.02. Additional Conditions to Obligations of Parent and Merger Sub. The obligations of Parent and Merger Sub to effect the Merger are further subject to the satisfaction or (to the extent permitted by Law) waiver at or prior to the Closing of each of the following conditions:

*        *        *

(f) No Actions Affecting SCPSC Petition. No Governmental Entity of competent jurisdiction shall have enacted any Order and no Change in Law (including no Change to the BLRA or the South Carolina Public Utility Laws) shall have been enacted, in each case which imposes any condition that would reasonably be expected to result in a (i) material change to the proposed terms, conditions,

or undertakings set forth in the SCPSC Petition or (ii) a significant change to the economic value of the proposed terms set forth in the SCPSC Petition, in each case as reasonably determined by Parent in good faith;

(g) <u>SCPSC Determination</u>. The SCPSC shall have (i) approved the Merger with no material Changes to the terms of the Merger, (ii) made a finding that the Merger is in the public interest or (iii) made a finding that there is an absence of harm to South Carolina rate payers as a result of the Merger; and

(h) <u>No Change in Law</u>. Since the date of this Agreement, there shall not have occurred any (i) substantive Change in any applicable Law or any Order with respect to the BLRA, as in effect on the date of this Agreement, which has or would reasonably be expected to have an adverse effect on the Company or any of its Subsidiaries or (ii) substantive Change in any applicable Law or any Order with respect to any other South Carolina Public Utility Law, as in effect as of the date of this Agreement, which has or would reasonably be expected to have an adverse effect on the Company or any of its Subsidiaries (such Changes as set forth in (i) and (ii), the "SC Law Changes").

**SCPSC Petition**

\*       \*       \*

3. The Petition will acknowledge that the Merger can only close if the SCPSC approves the jointly proposed NND Project cost recovery plan, with (x) no material change to the terms, conditions or undertakings set forth in the plan and (y) no significant change to the economic value of the plan, in each case as reasonably determined by Parent in good faith (except in each case unless otherwise consented to by Parent in its sole discretion), which shall include the following terms:

\*       \*       \*

g.       An SCPSC order directing that:

i.       The approximately $3.3 billion of invested capital for the new nuclear development project shall be included in a regulatory asset and recovered through rates over a 20-year amortization and recovery period that is reflected in retail electric revenue requirements without offset or disallowance until the regulatory asset is fully recovered . . . .

***The Proxy Materially Misleads By Omission***

39.    The Proxy, filed by Defendants with the SEC in connection with the Proposed

Transaction, omits material information that, if disclosed, would significantly alter the total mix

14

of information available to SCANA's stockholders.

40.     *First*, as alleged above, SCANA's stock price is currently severely depressed based on the possibility that it will not be able to recover $3.3 billion from ratepayers. (Indeed, if SCANA itself had a guarantee that it would be able to collect $3.3 billion from ratepayers, its stock price would increase substantially and likely exceed the Merger Consideration by a sizeable margin.) The various analyses relating to the fairness of the Proposed Transaction done by Morgan Stanley and RBC Capital are highly misleading in that they do not fully account for the fairness of the Proposed Transaction relative to Dominion's ability to collect the $3.3 billion from ratepayers -- *which is the only way that Dominion will consummate the Proposed Transaction*.

41.     *Second*, Dominion has negotiated itself into a win-win situation: It either buys SCANA shares so long as it is allowed to charge ratepayers $3.3 billion for the failed Nuclear Project, which would thereby make the price it is paying to SCANA shareholders a bargain, or else it walks away *without any financial consequences whatsoever*.   However, the language of the Proxy would lead a shareholder to conclude that Dominion would be obligated to pay a $280 million termination fee if it walks away from the Proposed Transaction. Specifically, as one of "SCANA's Reasons for the Merger," the Proxy states:

> The fact that, in the event that the merger agreement is terminated and a regulatory approval or clearance (other than the approval or clearance of the SCPSC) is not obtained under certain circumstances specified in the merger agreement or is terminated by SCANA for a material breach by Dominion Energy of its covenants to obtain regulatory approvals or clearance with respect to the proposed transaction and that breach caused a failure of any of the closing conditions relating to regulatory matters, SCANA will be entitled to receive a termination fee of $280,000,000 from Dominion Energy.

Meanwhile, while the Proxy states, as one of the "negative factors" of the Proposed Transaction, that Dominion Energy will not be obligated to complete the merger if "any South Carolina public utility law including the BLRA … is substantively changed in a manner that has or would

reasonably be expected to have an adverse effect on SCANA ….", the Proxy does not state that

the $280 million termination fee will not be triggered in such event.

42.    *Third*, the Proxy states, as another one of "SCANA's Reasons for the Merger,"

the following:

> The fact that Dominion Energy committed to propose to the SCPSC, among other things,
> a one-time rate credit to SCE&G's electric customers equal to an aggregate of $1.3
> billion, at least a 5% bill reduction from 2017 bills to SCE&G's electric customers, an
> approximately $1.7 billion write-off of capital and regulatory assets relating to the NND
> project (including a 20-year amortization period for costs associated with the NND
> project) and the completion of the $180 million purchase of a natural gas fired power
> station (the cost of which would not be included in setting rates for SCE&G's electric
> customers) . . . .

This statement misleadingly indicates that, should the Proposed Transaction be consummated,

SCANA shareholders would own shares in a company that would no longer have a cloud

hanging over its head as a result of the failed Nuclear Project.   However, while Dominion will

be collectively providing ratepayers with a one-time $1.3 billion credit following the

consummation of the Proposed Transaction, Dominion intends to charge the same ratepayers

*$3.3 billion for costs relating to the Nuclear Project*.   That fact would be important to a SCANA

shareholder since the attractiveness and value of the Proposed Transaction is at least in part

based on the removal the cloud currently hanging over SCANA as a result of the failed Nuclear

Project, as well as its willingness to pay the Merger Consideration amount without regard to

further recovery of Nuclear Project costs from ratepayers.

## COUNT I

### Against SCANA and the Individual Defendants for Violations of Section 14(a)
### of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder

43.    Plaintiff repeats and re-alleges each allegation set forth herein.

44.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange

Act, provides that Proxy communications with shareholders shall not contain "any statement

which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. s 240.14a-9.

45.     As discussed above, SCANA and the Individual Defendants filed and delivered the Proxy to Plaintiff, which they knew or recklessly disregarded contained material omissions and misstatements as set forth above.

46.     SCANA and the Individual Defendants violated § 14(a) and Rule 14a-9 of the Exchange Act by issuing the Proxy in which they made untrue statement of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or engaged in deceptive or manipulative acts or practices, in connection with the Proposed Transaction.  These defendants knew or recklessly disregarded that the Proxy failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

47.     By virtue of their positions within the Company and/or roles in the process and in the preparation of the Proxy, SCANA and the Individual Defendants were aware of this information and their obligation to disclose this information in the Proxy.

48.     The omissions and incomplete and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding whether to vote in favor of the Proposed Transaction.  In addition, a reasonable investor would view the information identified above which has been omitted from the Proxy as altering the "total mix" of information.

49.     SCANA and the Individual Defendants knowingly or with deliberate recklessness

omitted the material information identified above from the Proxy, causing certain statements therein to be materially incomplete and therefore misleading.

## COUNT II

### Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act

50.     Plaintiff repeats and re-alleges each allegation set forth herein.

51.     The Individual Defendants acted as controlling persons of SCANA within the meaning of section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of SCANA, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

52.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

53.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, each is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy.

54.     In addition, as the Proxy sets forth at length, and as described herein, the

Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions of which had input from the Individual Defendants. By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

55.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to section 20(a) of the Exchange Act.

**COUNT III**

**Claim for Aiding and Abetting**
<u>**Against Dominion and Merger Sub**</u>

56.    Plaintiff repeats and re-alleges each allegation set forth herein.

57.    Dominion and Merger Sub have acted and are acting with knowledge of, or with reckless disregard to, the fact that SCANA and the Individual Defendants are in breach of Section 14(a) and Section 20(a) of the Exchange Act.

58.    Dominion and Merger Sub knowingly aided and abetted the wrongdoing alleged herein.  In so doing, Dominion and Merger Sub rendered substantial assistance in order to effectuate the plan of SCANA and the Individual Defendants to consummate the Proposed Transaction.

59.    Dominion and Merger Sub have participated in the breach of the fiduciary duties by SCANA and the Individual Defendants for the purpose of advancing their own interests. Dominion and Merger Sub obtained and will obtain both direct and indirect benefits from colluding in or aiding and abetting the breaches of SCANA and the Individual Defendants.

60.    Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    declaring that the Proxy is materially false and/or misleading;

B.    enjoining, preliminarily and permanently, the Proposed Transaction, unless and until the Proxy makes full and clear disclosure of the matters alleged herein;

C.    awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

D.    granting Plaintiff such further relief as the Court deems just and proper.

Dated:  March 15, 2018

By:  /s/William R. Padget_____
     William R. Padget (Fed Id#09466)
     Finkel Law Firm LLC
     1201 Main Street, Suite 1800
     Columbia, South Carolina 29201
     *Attorneys for Plaintiff*

**OF COUNSEL:**

**WOLF HALDENSTEIN**
**ADLER FREEMAN &  HERZ LLP**
Gregory M. Nespole
Michael Jaffe
Gloria Kui Melwani
270 Madison Avenue
New York, NY 10016
(212) 545-4600 (telephone)
(212) 686-0114 (facsimile)
nespole@whafh.com
jaffe@whafh.com
melwani@whafh.com